**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**LESHON EUGENE JOHNSON**<br>**a/k/a Shon Johnson**<br><br>***Defendant.*** | **Case No. CR-25-12-JFH** |

**GOVERNMENT'S MOTION FOR UPWARD VARIANCE**
**AND MEMORANDUM IN SUPPORT**

COMES NOW the United States of America and moves the Court for an upwardly-variant sentence as to Defendant LeShon Johnson. This motion is filed pursuant to the scheduling order entered on May 22, 2026 (ECF No. 231). Defendant indicated in his PSR objections dated April 29, 2026 that he would seek a downward variance. On June 8, 2026, counsel for the Government contacted counsel for Defendant to confirm that Defendant would oppose this motion. Counsel for Defendant confirmed that he opposes this motion.

As this Court knows from the trial last summer, this case is about the supply side of the dog fighting "industry" and the critical role that fighting dog suppliers like Defendant play in spreading the ills of dog fighting in this country. After his prior dog fighting conviction, Defendant did not choose a different path for himself, but instead simply changed his "kennel" name and kept going. He traded off his fame and reputation in the fighting pit to build an even larger and more lucrative business trafficking dogs to parties the Court referred to as Defendant's "dog-fighting customers." Order Denying Def.'s Mot. for New Trial at 8 (ECF No. 227). There have been no bigger fighting dog peddlers brought to justice than Defendant. His compound –

numbering 190 pit bull-type dogs – was the largest ever discovered by federal law enforcement in the possession of a single person, by a wide margin.

Although the jury did not convict Defendant on all of the possession counts, evidence of Defendant's relevant conduct shows that the dogs in the illegal sales transactions for which he was convicted in Counts Twenty, Twenty-Two, and Twenty-Three were just three among *thousands* of dogs who passed through Defendant's dog fighting puppy mill. Defendant made hundreds of thousands of dollars generating and trafficking these dogs to be criminally abused by other dog fighters across the country. Given the extraordinary scope, size, and duration of Defendant's operation, if anyone in this "industry" merits a substantial upward variance, surely it is Defendant. As set forth below, based on the factors set forth in 18 U.S.C. § 3553(a) and precedent in other dog fighting cases, Defendant merits an upward variance to a custodial sentence of 120 months.

## I. Legal Background

Section 2156 of Title 7, United States Code is a comprehensive measure enacted by Congress to prevent the "gruesome and inhumane practice" of dog fighting. 153 CONG. REC. H3033 (Mar. 26, 2007). It criminalizes every aspect of dog fighting, including the commercial activities without which dog fighting would not occur – from the fights themselves, to the possession of dogs intended for fighting, to the supply and trafficking of fighting dogs. Specifically, the animal fighting prohibitions of the federal Animal Welfare Act make it unlawful to "knowingly sponsor or exhibit an animal in an animal fighting venture" – *i.e.*, the animal fights themselves. 7 U.S.C. § 2156(a)(1). It is also unlawful to "knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an

animal fighting venture." 7 U.S.C. § 2156(b). Each of these violations is punishable by the same maximum penalty – five years in prison. 18 U.S.C. § 49.

## II. Procedural History

A Grand Jury sitting in the Eastern District of Oklahoma returned a twenty-one count Indictment against Defendant on January 14, 2025, and a twenty-three count Superseding Indictment on May 14, 2025. Counts One through Nineteen of the Superseding Indictment charged Defendant with possessing dogs for use in an animal fighting venture on or about October 17, 2025, the date federal agents seized 190 pit bull-type dogs at his residence and dog yard. It is common in dog fighting cases for the Government to charge one count per dog, based on the plain language of the statute. *See*, *e.g.*, *United States v. Casillas-Montero*, 152 F.4th 306, 320 (1st Cir. 2025) (rejecting multiplicity challenge where government charged one count per dog and affirming upward variance to 84 months in dog fighting case). However, due to the sheer enormity of Defendant's operation, the Government used a different unit of prosecution here, charging one possession count in Counts One through Nineteen for every ten dogs seized. Count Twenty-One also charged Johnson with possessing a specific dog for use in an animal fighting venture. Counts Twenty, Twenty-Two and Twenty-Three charged Johnson with the sale of dogs for use in an animal fighting venture.

After heavy motions practice, the matter proceeded to trial on July 28, 2025. Following a five-day trial, the jury convicted Defendant on Counts One, Two, and Twenty through Twenty-Three, and acquitted him on the remaining possession counts. *See* ECF No. 206 (Minute Sheet – Jury Trial). Defendant moved for a new trial. *See* ECF No. 224. The Court denied the motion. *See* ECF No. 227. On April 3, 2026, the U.S. Probation Office released the Draft Presentence

Investigation. The parties each lodged objections. The U.S. Probation Office submitted the Final Presentence Investigation Report (hereinafter "PSR") on May 21, 2026. *See* ECF No. 230.

As the Government will note in its concurrently-filed Notice of Unresolved Objections, Defendant's Total Offense Level should be 27, which yields a Guidelines range of 70-87 months' imprisonment. The PSR calculates the Total Offense Level as 16, with Guidelines range of 21-27 months' imprisonment. Most of the difference is accounted for in the grouping analysis under U.S.S.G. §3D1.2. The Government will argue its objections in its forthcoming sentencing memorandum. However, as explained below, Defendant warrants an upward variance to a 120-month sentence regardless of which Total Offense Level is used.

## III. Application of the 18 U.S.C. § 3553(a) Factors Weighs Strongly in Favor of a Significant Upward Variance.

In addition to considering the advisory Guidelines range sentence, as the Court is well aware, courts must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, the need to provide deterrence and promote respect for the law, and the need to avoid unwarranted sentencing disparities conduct. 18 U.S.C. § 3553(a)(1)-(7). When those factors are applied here, an upward variance is plainly warranted, and a sentence of 120 months would avoid disparities with other cases.

### A. Nature and Circumstances of the Offense

Organized dog fighting bears no resemblance to the quarreling that pet dogs might do in a backyard over a toy. It is an extreme form of cruelty to animals – not only inside the fighting ring itself, but also in the specific practices leading up to a fight and, if either dog survives, after a fight. *See*, *e.g.*, *United States v. Berry, et al.*, 3:09-cr-30101, 2010 WL 1882057 (S.D. Ill., May 11, 2010) (court's sentencing memorandum, outlining the rituals and practices of the dog fighting "industry") (attached as Exhibit A); *United States v. Courtland, et al.*, 642 F.3d 545, 551

(7th Cir. 2011) (rejecting defense challenge to the court's sentencing memorandum in *Berry* and affirming above-guidelines sentence). Some who participate in the dog fighting industry are motivated by financial gain. Some take sadistic pleasure in the violence. For others, the practice is an egocentric projection of their supposed toughness onto the body of an animal who does the work and suffering for them. Dog fighting yields nothing positive for society at all.

The very nature of the offense has moved courts to impose significant consequences. For instance, in *United States v. Gaines*, the court varied upward to a sentence of 42 months for a defendant who possessed six fighting dogs (under the old version of §2E3.1 which provided a base offense level of 10 rather than 16), finding that:

> this offense embodies such cruelty, just the enterprise of training dogs to fight, of staging dogs to fight, of keeping dogs in boxes in the basement, of medicating them by people who are not trained in medicine . . . the very concept of this enterprise of staging dogs to fight each other and kill each other is so despicable and so uncivilized that I think the nature of the offense warrants a variance.

3:17-cr-309-AET, Tr. of Sentencing H'g at 17 (D.N.J. Mar. 5, 2018) (attached as Exhibit B), *aff'd*, 765 Fed. App'x 730, 733 (3d Cir. Apr. 3, 2019) (affirming above-Guidelines sentence and remarking that the case was "a sad reminder that man's best friend is susceptible to man's worst impulses"); *see also id.* at 19 ("I don't know that there's any way we can quantify really how harmful this crime is"). Of note, as here, the charges in *Gaines* did not involve any specific dog fights, but rather, the possession and interstate trafficking of fighting dogs.

The evidence in this case shows why such strong sentiments are warranted. For instance, in denying Defendant's motion for a new trial, the Court summarized several video exhibits that had been admitted into evidence at trial. *See* Order and Opinion at 7-8 (ECF No. 227). These videos, all obtained from Defendant's phone, provide a window into the ultimate purpose of his business and show exactly the kind of suffering and cruelty Congress sought to prevent when it

criminalized the trafficking of dogs for fighting. *See* 18 U.S.C. § 49(a) (establishing five-year felony liability for both fighting animals and for possessing, training, selling, delivering, transporting, and receiving them for fighting purposes). Among others the Court described were, in the Court's words:

> Govt's Exhibit 38: This is a video Defendant sent in a WhatsApp message thread between Defendant and L.R. The video shows dogs in a fighting ring. Someone in the video counts down to when the dogs can fight again. At the end of the video, one of the dogs is seen laying in the corner injured and unable to get up.
>
> Govt's Exhibit 45: This is a video Defendant sent L.R. in a text thread. The video shows an injured dog, and Defendant says the dog fought two other dogs.
>
> Govt's Exhibit 69: This is a video sent in a large WhatsApp group chat that included Defendant. The group chat discusses a dog fight to be held that day between dogs Spartacus and Ragnar. The video shows a dog down on the ground struggling.
>
> . . .
>
> Govt's Exhibit 117: This is a video sent in a WhatsApp message thread with L.R. and Defendant. In the video, Defendant can be heard calling to a dog with extensive injuries.
>
> . . .
>
> Govt's Exhibit 138: This is a video Defendant sent to L.R. in a text thread. The video shows a dead dog on a makeshift spring pole.

*Id.* Defendant was not only desensitized to the staged cruelty of dog fighting but actively furthered it for profit. That he did so on such a widespread basis weighs in favor of an upward variance.

### B. History and Characteristics of the Defendant

As previously stated, this case involves the largest seizure of fighting dogs – 190 live dogs and at least one dead dog – from a single person in the history of the Department of Justice. The second largest (114 dogs) was from Donnie Anderson in the Middle District of Alabama and

will be discussed below. *See United States v. Anderson*, 3:13-cr-100, Tr. of Sentencing Hearing at 81 (M.D. Ala., Nov. 17, 2014) (attached as Exhibit C; departing and varying up from 12-18 month Guidelines range to a sentence of 96 months on two dog fighting counts). Defendant's operation dramatically eclipses even that of Anderson. The scope of a defendant's dog "yard" is significant because with dog fighting and the housing and training that go along with it, "each animal experiences suffering individually," not collectively. *Casillas-Montero*, 152 F.4th at 320.

Most of the seized dogs were likely intended for sale, as evidenced by the voluminous customer correspondence Defendant engaged in on a daily basis by text message, e-mail, and WhatsApp. *See*, *e.g.*, PSR ¶ 19. In these messages, Defendant advertised dogs, stud rights, and semen for sale from his most desirable fighting dogs for thousands of dollars, announced upcoming breedings and litters, sent fighting dog pedigrees to interested buyers, answered sales inquiries, coordinated the transport of live dogs, and solicited and tracked electronic payments. *See id.* CashApp records introduced at trial contain an overwhelming volume of dog transactions. *See* Exhibit D (Gov't Trial. Ex. 218). In essence, Defendant ran a dog fighting puppy mill.

Counts Twenty, Twenty-Two, and Twenty-Three are exemplary of such transactions. The jury convicted Defendant on each of these, which were the only counts in the Superseding Indictment alleging illegal sales of dogs for fighting purposes. In Counts Twenty-Two and Twenty-Three, for instance, evidence at trial demonstrated that Defendant sold two dogs from fighting dog "bloodlines" to a person labeled "Newton Arnold" on Defendant's phone, in Fort Wayne, Indiana.[1] *See* Gov't Trial. Exs. 157-158 (non-video trial exhibits attached here as Exhibit

---

[1] Someone named Newton Arnold was arrested on dog fighting charges in Indiana the same day the jury rendered its verdict in this case. *See* Exhibit F. Arnold's case involves fourteen counts of purchasing/possessing a fighting animal, one count of animal fighting paraphernalia, and a firearms charge. *See State v. Arnold*, 02D06-2508-F4-000089 (Ind. Super. Ct., Allen County,

E); PSR ¶ 26. The customer sent a $1,000 deposit sent to Defendant's wife's CashApp account, which they discussed as being a good way to avoid law enforcement detection. *See id*. A few months after the sale of the two dogs, Arnold sent messages to Defendant to provide him with an update on one of the dogs, stating she "quit in 25 minutes," thereby losing a wager for the handler. Gov't Trial Exs. 160, 161. As the Government's expert witness explained at trial, the success of the fighting dogs sold to others reflects on the seller and can affect the value of the seller's dogs and future offspring.

The October 17, 2024 search warrants were a snapshot of Defendant's stock of dogs at that time. They do not capture the full breadth of Defendant's long-running, lucrative business illegally selling fighting dogs, all of which is relevant conduct pursuant to U.S.S.G. §1B1.4. Setting aside the dogs at issue in the acquitted possession counts, other evidence admitted at trial speaks to the historical scope of Defendant's illegal business. In particular, Gov't Trial Ex. 218, which lists payments received and sent by the CashApp account of Mal Kant Kennels, shows a gross incoming cash flow of $446,193.50 and a net income of $365,539.50 from 2020 to just before the search warrants in this case. *See* Exhibit D. This does not include payments sent to Defendant's wife's accounts to try to conceal them. Agents also seized paper fighting dog "pedigrees," *see*, *e.g.*, Gov't Trial Ex. 33, and located many similar electronic documents for dogs owned by Defendant on a dog fighting website. *See*, *e.g.*, Gov't Trial Ex. 24.

To build a fuller picture of Defendant's relevant conduct that *excludes* (pre-dates) the specific dogs in the Superseding Indictment in this case, FBI Special Agent Raquel Mobley analyzed: (1) the paper fighting dog pedigrees seized from Defendant; (2) the online fighting dog pedigrees for Defendant's dog fighting "kennel"; and (3) the CashApp transactions. Agent

---

Aug. 4, 2025) (docket attached as Exhibit G). Trial is set for August 18, 2026. Fort Wayne is in Allen County.

Mobley's findings, about which she will testify at the sentencing hearing, are attached and summarized as follows.

Exhibit H: Analysis of Paper Pedigrees

- Paper pedigrees seized from Defendant show his ownership/possession over the years of 192 dogs. This is by no means the total number that he owned – this is just the dogs identified by one category of evidence. Based on the ages listed for those dogs on the pedigrees (some were born twenty years ago), Agent Mobley conservatively estimated that 125 of those were not present at the search warrant because they would have died from old age and/or were older than the estimated ages the veterinarians assigned to the seized dogs (see Exhibit I). We cannot exclude the possibility that some of the remaining 67 dogs were also not present due to having been sold, but **at a minimum this shows 125 additional dogs from one category of evidence,** besides the dogs at the search warrant.

Exhibit J: Analysis of Cash App Records

- From another category of evidence, CashApp subpoena returns show that Defendant sold **at least 180 puppies not included in the indictment** (because they had already been sold before the search warrant). This includes only those transactions for which the buyer expressly referenced buying puppies or dogs from a certain litter.

Exhibit K: "Peds Online" Pedigrees

- Lastly, from a third category of evidence, fighting dog pedigrees from the dog fighting website "Peds Online" attributed to Defendant's kennel include a total of 2,083 named offspring, as well as 1,097 litters where the offspring were not named. Assuming a conservative litter size of three dogs at the low end and five dogs at the high end, the total **estimated range of puppies born was between 3,291 and 5,485**.

In sum, Defendant's unlawful trafficking of hundreds if not thousands of fighting dogs generated hundreds of thousands of dollars' worth of illegal income over the last few years prior to the search warrants.

The substantive Guideline for animal fighting offenses, §2E3.1, previously provided a guided upward departure in the application notes where the "the offense involved animal fighting on an exceptional scale (such as an offense involving an unusually large number of animals)." *See* U.S.S.G. §2E3.1, Note 2 (2024). Although the Guidelines no longer include most departure provisions, the unusually large number of animals and transactions at issue here supports an

upward variance under 18 U.S.C. § 3553(a)(1) for the same reasons, as the history and characteristics of Defendant show him to be a fighting dog trafficker without peer.

**C. Seriousness of the Offense, Respect for the Law and Just Punishment**

Over the last decade, there has been increased public awareness of the serious, violent nature of animal fighting, as reflected by Congress's repeated strengthening of the Animal Welfare Act.[2] The U.S. Sentencing Commission also increased the base offense level of the pertinent Guideline, U.S.S.G. §2E3.1, from 10 to 16, in November, 2016. The Commission stated that the increased base offense level "better accounts for the cruelty and violence that is characteristic of these crimes," underscoring the seriousness of the offense. SENTENCING GUIDELINES FOR UNITED STATES COURTS, 81 Fed. Reg. 27,262, 27,265 (May 5, 2016). The Court should impose a sentence in this case that will promote respect for the Animal Welfare Act and its purposes.

Defendant in particular has demonstrated a profound lack of respect for the law, in that his response to his prior felony dog fighting conviction was not to depart from his illegal practices, but rather, to grow an even larger illegal business. Oklahoma state authorities arrested Defendant in May of 2004 after agents witnessed him fight two of his dogs during a dog fighting event in Wetumka. *See* PSR ¶ 44. The charging document in that case alleged a racketeering enterprise operated by Defendant and fourteen others who bred and sold fighting dogs, staged

[2] Congress has strengthened the law four times over the last twenty years, including: the Animal Fighting Prohibition Enforcement Act of 2007, Pub. Law 110–22, 121 Stat. 88, which increased animal fighting from a misdemeanor with a one-year statutory maximum to a felony with a three-year statutory maximum; the 2008 Farm Bill, Pub. Law 110–234, Sec. 12407, 122 Stat. 923, which raised the statutory maximum to five years, relaxed the interstate commerce element, and added substantive prohibitions; the 2014 Farm Bill, Pub. Law 113-79, Sec. 12308, 128 Stat. 649, which made attending animal fights a misdemeanor offense and added a felony offense for bringing anyone 16 years or younger to an animal fight; and an amendment effective December 20, 2019, which broadened the reach of the statute to all U.S. territories. *See* Pub. Law 115-334, Sec. 12616(a)-(c), 132 Stat. 5015.

dog fight events with illegal gambling, and used weapons and communications devices in furtherance of these felonies. *Id.* Authorities seized dozens of dogs. At that time, Defendant's so-called "kennel" was called "Krazyside Kennels." He pleaded guilty to three felony counts and received a five-year deferred sentence on December 20, 2005. *Id.*

Instead of treating that deferred sentence as the gift that it was, and altering his course of criminal conduct, Defendant went right on as if nothing had happened. During the pendency of his state case, he posted the dog "Mal Kant's Lynch POR" on the "Peds Online" dog fighting website. *See* Exhibit K at 1. In 2006, he bred and posted the dog "Mal Kant's Stoneman." *See id.* at 2. Less than 18 months into what would have been his five-year sentence, on April 7, 2007, Defendant formally registered himself as "Mal Kant Kennels" with a registry used by dog fighters. *See* Gov't Trial Ex. 28. His illegal business metastasized from there. The paper and online pedigree documents show a continuous operation from then on until the date of the search warrants in this case. *See* Exhibits H and K. Defendant's operation was not only of incredible size, but also in continuous operation for more than two decades. His history and characteristics clearly warrant an upward variance.

**D. Need to Afford Adequate Deterrence to Criminal Conduct**

Dog fighting is a highly secretive enterprise that is difficult for law enforcement and investigative professionals to infiltrate. A dog fighting investigation requires many of the same skills and resources employed in major undercover narcotics investigations, thus challenging the resources of any agency that seeks to respond to it. Given the limited law enforcement resources available for cases such as this, and the strain it places upon animal shelters called upon to care for the large numbers of dogs seized in these investigations, it is imperative that the sentences imposed in the cases that are able to be brought send a strong message of general deterrence.

Those who choose to brutalize animals for entertainment and profit must know that their criminal conduct will be severely punished. *See Gaines*, *supra*, Tr. of Sentencing H'g at 18 ("animal cruelty is a horrible offense, uncivilized, and warrants punishment and deterrence. It's important for society to know that this is a serious offense, that it's a grievous offense, that the animals deserve something better than this"). Consequently, a strong sentence is needed to "afford adequate deterrence to criminal conduct" to other potential offenders. 18 U.S.C. § 3553(a)(2)(B).

Specific deterrence to this defendant is also needed. As noted above, Defendant shrugged off his prior felony dog fighting conviction and simply re-labeled his dog fighting "kennel" so that he could continue profiting from the suffering of animals. A significant upward variance will both incapacitate and deter Defendant from again returning to these unlawful and cruel ways.

**E. Avoiding Unwarranted Sentencing Disparities Among Similarly Situated Defendants**

There have been no federal defendants truly situated similarly to Defendant here, based on sheer scope and scale as illustrated above. Nonetheless, pursuant to 18 U.S.C. § 3553(a)(6), in an attempt to minimize sentencing disparities, the Government looked to the closest comparable cases involving lesser but still large amounts of dogs in the possession of a single defendant.

At the time the Government seized Defendant's dogs, the federal case in which the most fighting dogs had previously been seized from a single person was *United States v. Anderson*, 3:13-cr-100 (ECF No. 723) (M.D. Ala., Nov. 17, 2014). Donnie Anderson had 114 dogs and was engaged in an extensive dog fighting conspiracy that featured several fight events. He pleaded guilty to seven substantive and conspiracy dog fighting counts and was in criminal history category I. The court in that case departed and varied upward from Anderson's 12-18 month Guidelines range to a sentence of 96 months, based in part on the neglected condition of so many dogs and in part on the court's dissatisfaction with the low offense level. *United States v.*

*Anderson*, 3:13-cr-100, Tr. of Sentencing Hearing at 84 (M.D. Ala., Nov. 17, 2014) (attached as Exhibit C). At that time, U.S.S.G. §2E3.1 (dog fighting) carried an offense level of 10, rather than the 16 that it has had since 2016.

Carlton Adams had the third-most – 78 dogs. *See United States v. Adams*, 2:24-cr-122 (N.D. Ala. Mar. 28, 2024). There were no "sponsor or exhibit" charges in that matter – only possession of fighting dogs. Adams pleaded guilty in January to four dog possession counts and two 18 U.S.C. § 922(g) counts. He was in criminal history category II. The court in that matter sentenced him on May 29, 2026 to 120 months on the dog possession counts, with the gun charges to run concurrent with each other and to the dog counts. *See Adams*, Judgment (ECF No. 137) (N.D. Ala. May 29, 2026) (attached as Exhibit L). This was an upward variance from a Guidelines range of 46-57 months.

In *United States v. Hargrove*, 7:10-cr-135 (E.D.N.C. Nov. 17, 2010) the defendant was found in possession of 35 dogs. He was a legendary old-school persona in the dog fighting community who was past his prime. The court sentenced him, at age 78, to the statutory maximum of 60 months on the sole count to which he pleaded guilty. This sentence was multiple times the high end of his Guidelines range as calculated in the PSR. The Fourth Circuit affirmed the sentence, which had been imposed at a time when the offense level was 10, not 16. 701 F.3d 156, 159-160 (4th Cir. 2012). In sentencing Hargrove to the statutory maximum of 60 months on the single count of conviction, the District Court made clear that it would have imposed an even greater sentence if it could have:

> It seems to me that the salient or critical event given the incredibly barbaric nature of this case, the critical event was being able to manage a plea to one five year case. That drove the whole outcome of this case, because if he had been charged independently and . . . if he had been indicted for other charges, he would be facing significantly more time.

*See Hargrove*, Tr. of Sentencing H'g, 7:10-cr-135, ECF No. 42 at 45–46 (E.D.N.C. Aug 4, 2011) (Exhibit M).

Another case with similarities worth noting is *United States v. Richardson*, 7:16-cr-122, 2017 WL 6055773, *2-3 (E.D.N.C. Dec. 1, 2017), *aff'd*, 796 Fed. App'x 795, 803 (4th Cir. Dec. 12, 2019). This was the first dog fighting case to be sentenced based on the newly-raised offense level of 16 after the 2016 amendments to the Guidelines. Richardson had 32 dogs. He pleaded guilty to one dog fighting conspiracy charge and one possession charge. *See id.* at *1. He was in criminal history category I. *Id.* at *2. The court departed and varied upward from a 12-18 month Guidelines range to a 96-month sentence, based on the "scale of defendant's involvement in dog fighting, the inadequacy of accounting for defendant's criminal history, and the existence of related uncharged [drug] conduct." *Id.* Specifically, the court noted that Richardson had been "working to expand the reach of dog fighting in this district," including by "driving a van full of dogs from a breeder in Oklahoma." *Id.* "Because of the scale of his involvement," the court reasoned, "an upward departure is appropriate." *Id.* Further, in a striking parallel, the court found that Richardson's

> character indicates that a higher sentence is warranted. He was first cited for cruelty to animals in 2004, more than twelve years ago. His lengthy criminal history and the flagrancy of his participation in dog fighting show both his lack of respect for the law and his likelihood to continue committing crimes. A variant sentence is necessary to provide adequate punishment and deterrence.

*Id.* at *3.

Defendant's operation far eclipses all of these, even Anderson's. Although none of these is a close comparison to Defendant, all are nonetheless useful as points of reference. All recognized the significant dog fighting involvement of the defendant at issue, whether measured in dogs or years. All imposed sentences that were multiple times the high end of the Guidelines

range, whether under the new (BOL 16) or old (BOL 10) version of §2E3.1. Some involved drugs or weapons conduct as noted above, but none had anywhere close to the number of dogs. And unlike Defendant, all accepted responsibility for their crimes and pleaded rather than going to trial. Accounting for these similarities and differences, the Court should vary upward to a sentence of 120 months.

## IV. Conclusion

Defendant has contributed as much to the growth of dog fighting in this country as anyone yet encountered by federal law enforcement. His illegal business was essentially a dog fighting puppy mill, fully showcasing the worst of both enterprises. He has made a mockery out of the sentence imposed in his prior felony dog fighting conviction, compounding rather than turning from his illegal actions. The sheer size of his operation, let alone other aggravating factors described above, warrants a substantial upward variance.

Respectfully submitted this 18th day of June, 2026,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Div.
United States Department of Justice

s/ Ethan C. Eddy
ETHAN EDDY
Cal. Bar # 237214
Ethan.Eddy@usdoj.gov
Senior Trial Attorney
Environmental Crimes Section
150 M St. NE, Room 4.206
Washington, DC 20002
Telephone: (202) 532-3181

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2026, I served the foregoing through the Court's CM/ECF system, which will notify all parties of record as follows:

Billy Coyle, Attorney for Defendant

s/ Ethan C. Eddy
Senior Trial Attorney
U.S. Department of Justice